IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| TAMRA A.W., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of Social Security, <br><br> Defendant. | Case No. 22-CV-1099-JAR |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of the final decision of Defendant Commissioner of Social Security denying Plaintiff's application for disability and disability insurance benefits under Title II and supplemental security income benefits under Title XVI of the Social Security Act. Plaintiff asserts that the Administrative Law Judge ("ALJ") failed to appropriately evaluate Plaintiff's migraines at steps three and four of his evaluation. Having reviewed the record, and as described below, the Court reverses the order of the Commissioner and remands the case.

**I.     Procedural History**

On August 24, 2020, Plaintiff protectively applied for a period of disability, disability insurance benefits, and supplemental security income. She alleged a disability onset date of August 1, 2019. Plaintiff's applications were denied initially and upon reconsideration. She then asked for a hearing before an ALJ.

After a telephonic hearing on November 16, 2021, the ALJ issued a written decision on November 29, 2021, finding that Plaintiff was not disabled. Given the unfavorable result,

Plaintiff requested reconsideration of the ALJ's decision from the Appeals Council.  Plaintiff also submitted additional evidence to the Appeals Council.

Plaintiff's request for review was denied on February 28, 2022.  In this denial, the Appeals Council noted that evidence between November 2, 2021 through November 30, 2021 did not show a reasonable probability that it would change the outcome of the decision.  The Appeals Council also noted that evidence dated December 2, 2021 through January 31, 2022 did not relate to the period at issue and thus did not affect the ALJ's November 29, 2021 decision.  Accordingly, the ALJ's November 2021 decision became the final decision of the Commissioner.

Plaintiff filed a Complaint in the United States District Court for the District of Kansas.  She seeks reversal of the ALJ's decision and remand for a new administrative hearing.  Because Plaintiff has exhausted all administrative remedies available, this Court has jurisdiction to review the decision.

## II.   Standard for Judicial Review

Judicial review under 42 U.S.C. § 405(g) is limited to whether the Commissioner's decision is supported by substantial evidence in the record as a whole and whether the Commissioner applied the correct legal standards.[1]  The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  In the course of its review, the court may not re-weigh the evidence or substitute its judgment for that of the Commissioner.[3]

---

[1] *See Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015).

[2] *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001) (quoting *Castellano v. Sec'y of Health & Hum. Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)).

[3] *Id.*

### III. Legal Standards and Analytical Framework

Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."[4]

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .[5]

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled.[6] The steps are designed to be followed in order. If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary.[7]

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability, (2) whether the claimant has a severe impairment, or combination of severe impairments, and (3) whether the severity of those impairments meets or equals a designated list of impairments.[8] "If the impairment does not meet or equal a listed impairment, the ALJ must

---

[4] 42 U.S.C. §§ 423(d)(2)(A), 416(i)(1)(a).

[5] *Id*. § 423(d)(2)(A).

[6] *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. §§ 404.1520(a), 416.920(a).

[7] *Barkley v. Astrue*, Case 09-1163-JTM, 2010 WL 3001753, at *2 (D. Kan. Jul. 28, 2010).

[8] *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (first quoting *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); and then quoting *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)); *see also Barkley*, 2010 WL 3001753, at *2 (citing *Williams*, 844 F.2d at 751).

3

determine the claimant's RFC, which is [the claimant's] ability to do physical and mental work activities on a sustained basis despite limitations from her impairments."[9]

Upon assessing the claimant's RFC, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform her past relevant work or whether she can generally perform other work that exists in the national economy, respectively.[10] The claimant bears the burden in steps one through four to prove a disability that prevents performance of her past relevant work.[11] The burden then shifts to the Commissioner at step five to show that, despite the claimant's alleged impairments, the claimant could perform other work in the national economy.[12]

Here, the ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since August 1, 2019—the application date. He determined at step two that Plaintiff had the following severe impairments: obesity, bilateral knee dysfunction, degenerative disc disease of thoracic spine, degenerative joint disease of the left shoulder, and migraines. At step three, the ALJ found that Plaintiff's impairments did not meet or equal the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. Continuing, he determined that Plaintiff had the RFC to

> Perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she can lift and/or carry/push and/or pull 20 pounds occasionally, 10 pounds frequently. She can sit, with normal breaks, for a total of 6 hours per 8-hour workday, and stand and/or walk, with normal breaks, for a total of 6 hours per 8-hour workday. The claimant can occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can occasionally

---

[9] *Barkley*, 2010 WL 3001753, at *2 (citing 20 C.F.R. § 416.920(e)); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

[10] *Barkley*, 2010 WL 3001753, at *2 (citing *Williams*, 844 F.2d at 751).

[11] *Lax*, 489 F.3d at 1084 (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005)).

[12] *Id.* (quoting *Hackett*, 395 F.3d at 1171).

>reach overhead with both upper extremities. The claimant can tolerate occasional exposure to extreme heat, humidity, and vibration. She must avoid unprotected heights and moving mechanical parts. The claimant can tolerate a moderate noise intensity as defined in the SCO.[13]

The ALJ determined at step four that Plaintiff was unable to perform any past relevant work. After considering Plaintiff's age, education, work experience, and RFC, he determined at step five that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. Thus, the ALJ concluded that Plaintiff had not been under a disability from August 1, 2019, through the date of his decision.

## IV.   Discussion

Plaintiff asserts that the ALJ erred at steps three and four when considering her migraines. Specifically, at step three, Plaintiff contends that the ALJ failed to adequately address whether Plaintiff's migraines met or equaled a listed impairment. In addition, at step four, Plaintiff argues that the ALJ failed to adequately account for her migraines in her RFC. The Commissioner contends that the ALJ reasonably considered Plaintiff's migraines in both steps of the analysis.

### A.   *Step Three*

Plaintiff first argues that the ALJ erred in not finding that her migraines were per se disabling under the listings. She contends that her migraines met or equaled Listing 11.02. At step three of the sequential process, an ALJ considers whether a claimant's impairment meets or is equivalent to a listed impairment.[14] If the impairment "meets all the criteria of any listed impairment in the listings, [the ALJ] will find that the individual is disabled."[15] If the

---

[13] Doc. 10-3 at 31.

[14] *Lax*, 489 F.3d at 1085 (citing *Williams*, 844 F.2d at 751).

[15] SSR 17-2p, 2017 WL 3928306, at *2 (Mar. 27, 2017).

5

individual's impairment does not meet all the listing requirements, the ALJ then determines "whether the individual's impairment(s) medically equals a listed impairment. An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment."[16]

When considering primary headache disorders, SSR 19-4p provides guidance on how to evaluate them.[17] SSR 19-4p notes that a "[p]rimary headache disorder is not a listed impairment in the Listing of Impairments," but it may "alone or in combination with another impairment(s), medically equal[] a listing."[18] Because primary headache disorder is not a listing, SSR 19-4 states that epilepsy, Listing 11.02, "is the most closely analogous listed impairment."[19] It notes that "[w]hile uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures)," and thus a primary headache disorder may medically equal the listing.[20]

At step three, the ALJ stated that "[t]he claimant's migraines are not directly addressed by a listing. As indicated in SSR 19-4p covering headache disorders, the most comparable listing is listing 11.02 on epilepsy. The documented frequency and severity of the claimant's headaches does not rise to the level described in the listing."[21] Plaintiff contends that the ALJ's statement was brief, conclusory, and contrary to the evidence.

The Commissioner argues that there was no evidence that Plaintiff's headaches or seizures were so severe that they caused alteration of consciousness, and thus she could not show

---

[16] *Id.*

[17] SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019).

[18] *Id.* at *7.

[19] *Id.*

[20] *Id.*

[21] Doc. 10-3 at 31.

that her headaches equaled the listing of 11.02(B) and 11.02(D).[22] The Commissioner also asserts that the ALJ pointed this out at step three. The Commissioner's argument fails.

First, the ALJ did not discuss evidence regarding seizures/headaches causing altered consciousness, so the ALJ did *not* point this out at step three. The ALJ simply stated that the documented frequency and severity of Plaintiff's headaches did not rise to the Listing 11.02 level. The Commissioner cannot make, and the Court cannot accept, a post-hoc rationalization.[23]

In addition, the Commissioner is mistaken that Plaintiff must show with evidence that her migraines were so severe that they caused alteration of consciousness. Plaintiff does not have epilepsy and Listing 11.02 addresses epilepsy. Instead, with a primary headache disorder, "a claimant must have documented migraine headaches from an acceptable medical source with the same frequency that a person with epilepsy has seizures."[24] In addition, SSR 19-4p explains that to evaluate whether a primary headache disorder is equal in severity or duration to the epilepsy criteria in 11.02B or 11.02D, the ALJ considers other factors.[25] Specifically, SSR 19-4p provides:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an

---

[22] The Court notes that the Commissioner says both that there is no evidence that Plaintiff's *headaches* or *seizures* were so severe that they caused loss of consciousness. It is unclear whether Commissioner intended to discuss seizures, but Plaintiff need not show that she had seizures for her headaches to be medically equivalent to 11.02. "Simply stated, evidence that a claimant did not experience seizures is irrelevant to the question of whether that claimant's migraine impairment is medically equivalent to Listing 11.02. Instead, evidence regarding the frequency and severity of the migraines must be considered in assessing whether a claimant's migraine impairment medically equals Listing 11.02." *See Jandt v. Saul*, No. 1:20-CV-00045-HBB, 2021 WL 467200, at *8 (W.D. Ky. Feb. 9, 2021) (citation omitted).

[23] *Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007) (citations omitted).

[24] *Warrior v. Kijakazi*, 583 F. Supp. 3d 1191, 1203 (E.D. Wis. 2022).

[25] SSR 19-4p, 2019 WL 4169635, at *7.

> AMS [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).
>
> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting of managing oneself.[26]

Thus, Plaintiff does not have to demonstrate that she has dyscognitive seizures (characterized by alteration of consciousness).[27] Instead, she must demonstrate that she has migraines "occurring at least once a week for at least three consecutive months."[28] In addition, she must demonstrate that she has migraines "occurring at least once every 2 weeks for at least three consecutive months despite adherence to prescribed treatment, and marked limitation in one area of

---

[26] *Id.*

[27] The Commissioner also argues that Plaintiff cannot meet the criteria of Listing 11.02(A) and 11.02(C) because there is no evidence that she lost consciousness. But when evaluating whether a primary headache disorder meets Listing 11.02, SSR 19-4p does not require a claimant to demonstrate the criteria in 11.02(A) and (C). Instead, it states that "a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures)." SSR 19-4p, 2019 WL 4169635, at *7. Thus, Plaintiff does not need evidence demonstrating that she lost consciousness.

[28] *Id.* (referencing 11.02B criteria).

functioning."[29]  And the focus should be "on records from the treating sources memorializing Plaintiff's statements regarding: her symptoms such as aura, the intensity and type of headache pain, nausea, photophobia, the need to lie down in a quiet dark room, medications prescribed, and the duration and frequency of the headaches."[30]

The ALJ's step three finding referenced Listing 11.02 and SSR 19-4p, but his finding was brief and conclusory as he simply stated that the documented frequency and severity of Plaintiff's headaches did not rise to the level of the listing.  An ALJ's failure to include specific findings at step three, however, may be harmless error if he provides sufficient rationale at a later step in the sequential evaluation process "for a subsequent reviewer or the court to determine the basis for the finding about medical equivalence at step 3."[31]  Thus, the Court must consider whether the ALJ's later discussion in the RFC analysis includes sufficient findings to support the step three determination that Plaintiff's headaches did not meet or medically equal Listing 11.02.

### B.     *Step Four Discussion*

In the step four RFC discussion, the ALJ specifically stated that he evaluated Plaintiff's migraines as directed by SSR 19-4p.[32]  He noted that they were a "fairly-recent development" as she reported occasional headaches that improved with sugar intake in May 2021, but subsequent to that date, she "endorsed frequent headaches with rare associated visual symptoms and some photophobia."[33]  The ALJ then discounted Plaintiff's migraines by noting that: (1) at treatment appointments, she did not appear in distress or have sensitivity to light or sound; (2) mental

---

[29] *Id.* (referencing 11.02D criteria).

[30] *Jandt v. Saul*, No. 1:20-CV-00045-HBB, 2021 WL 467200, at *10 (W.D. Ky. Feb. 8, 2021) (citation omitted).

[31] SSR 17-2p, 2017 WL 3928306, at *4 (Mar. 27, 2017).

[32] Doc. 10-3 at 37.

[33] *Id.*

status examinations routinely found Plaintiff to be alert and fully oriented; (3) a lumbar puncture showed no elevated pressure, and MRI and MRV of Plaintiff's brain were unremarkable; (4) neurosurgical evaluations and vision were normal; and (5) although Plaintiff could not tolerate Topamax, she declined headache treatment at her only emergency room visit.[34]

The evidence, however, that the ALJ used to discount Plaintiff's migraines is problematic. Although Plaintiff alleged that she experienced severe migraines frequently, she did not allege that she experienced them daily. If Plaintiff does not allege that "her headaches cause '*constant*, debilitating pain' . . . [but instead] contends that they cause pain and functional limitation *while they are occurring*," it would not be unusual that the medical records did not reflect abnormal clinical findings.[35] Thus, although the medical evidence demonstrated that Plaintiff did not experience distress or sensitivity to sound/light during appointments and her mental status exams showed her alert and fully oriented, this medical evidence would be expected because Plaintiff was not experiencing a migraine *at that time*.[36]

In addition, the ALJ discounted Plaintiff's headache by noting that "a lumbar puncture showed no elevated pressure, and MRI and MRV of the claimant's brain were unremarkable."[37] The ALJ also noted that her neurosurgical evaluations were normal, and her vision was normal. This medical evidence, however, simply demonstrates that Plaintiff's doctors did not find a secondary medical condition causing her headaches. But "[p]rimary headaches occur

---

[34] Doc. 10-3 at 37–38.

[35] *See Lindsay M. v. Kijakazi*, No. 21-2063-EFM, 2022 WL 612452, at *11 (D. Kan. Mar. 2, 2022).

[36] *Id.*

[37] Doc. 10-3 at 38.

10

independently and are not caused by another medical condition," while "[s]econdary headaches are symptoms of another medical condition."[38]

> Physicians diagnose a primary headache disorder after reviewing a person's full medical and headache history and conducting a physical and neurological examination. . . . To rule out other medical conditions that may result in the same or similar symptoms, a physician may also conduct laboratory tests or imaging scans. For example, physicians may use magnetic resonance imaging (MRI) to rule out other possible causes of headaches—such as a tumor—meaning that an unremarkable MRI is consistent with a primary headache disorder diagnosis.[39]

Accordingly, an unremarkable MRI, normal neurosurgical evaluations, and normal vision is not substantial evidence ruling out a primary headache disorder. Instead, it may be evidence consistent with a primary headache disorder, and it also demonstrates Plaintiff's and her physician's attempts to rule out secondary physical causes for Plaintiff's migraines.

Finally, the ALJ specifically noted that Plaintiff was not able to tolerate Topamax, and she declined headache treatment at her only emergency room visit. The evidence shows that after Plaintiff's doctor ruled out several underlying causes, the assessment was "chronic migraine" and "migraine with visual aura."[40] He stated that "[t]he character of her headaches is most consistent with a migraine type process."[41] And she was prescribed Topamax for her migraines. Shortly after being prescribed Topamax, she went to the emergency room where her chief complaint was "headache, confusion, slurring words at times—concerned about her home having mold o[r] diet medication causing this."[42] The physician recommended that she wean off

---

[38] SSR 19-4p, 2019 WL 4169635, at *3 (Aug. 26, 2019).

[39] *Id.* at *4.

[40] Doc. 10-10 at 2.

[41] *Id.*

[42] Doc. 10-8 at 152.

11

Topamax because her problems may be related to the use of it and noted that she declined treatment for headache at that time.

As Plaintiff notes, it is unclear what significance the ALJ took from Plaintiff's denial of medicine in this instance, but the ALJ should have considered the factors set forth in *Frey v. Bowen*.[43]  In *Frey*, the Tenth Circuit stated that when reviewing a plaintiff's failure to undertake treatment, there are four relevant elements including "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse."[44]

Here, the ALJ did not undertake this analysis,[45] and the Court notes that several of the factors appear to be in Plaintiff's favor.  First, treatment was not specifically prescribed at the emergency room.  In addition, if the emergency room physician indicated that Plaintiff's headache was likely caused by the medication Topamax and that she should wean from it, it would be justifiable to decline an alternative headache medicine when experiencing medication effects.  Furthermore, Plaintiff went to see her primary care provider the next day and agreed to follow up with her neurologist to see if alternative medications to Topamax were suggested.  The record indicates that she was prescribed an alternative migraine medication, Noritriptyline, approximately one week later, but still did not obtain relief from her headaches.

In sum, the evidence that the ALJ relied upon to discount Plaintiff's headaches is not substantial.  In addition, SSR 19-4p requires the ALJ to consider the frequency and severity of

---

[43] 816 F.2d 508 (10th Cir. 1987).

[44] *Id*. at 517 (citations omitted).

[45] The Commissioner asserts that the ALJ did not violate *Frey*. The Commissioner contends that the ALJ was simply pointing out that Plaintiff presented to the emergency room only once during the relevant period complaining of migraines to show that Plaintiff's claim of frequent headaches was not supported by the record. The Court disagrees with the Commissioner's post hoc justification as even the ALJ noted elsewhere in his decision that Plaintiff had headaches three to four times a week.

the migraines.[46] When discussing SSR 19-4p in the RFC portion of the ALJ's decision, although the ALJ noted the medical evidence discussed above, he did not specifically acknowledge the *severity* level of Plaintiff's headaches. Instead, he simply stated that they did not occur at a frequency that would result in physical limitations.[47] Thus, his discussion lacked specific findings as to the severity of Plaintiff's migraines.

SSR 19-4p provides that a primary headache disorder is "typically severe enough to require prescribed medication and sometimes warrant emergency department visits."[48] The evidence shows that Plaintiff was prescribed medication and went to the emergency room. In addition, when considering whether a primary headache disorder may medically equal Listing 11.02, SSR 19-4p directs the ALJ to consider such things as adherence to prescribed treatment and side effects of treatment.[49] Here, the evidence shows that Plaintiff adhered to treatment, that she suffered side effects from that treatment, began new treatment, but she still suffered from migraines.

SSR 19-4p also provides that "[i]t is helpful to a physician when a person keeps a 'headache journal' to document when the headaches occur, how long they last, what symptoms are associated with the headaches, and other co-occurring environmental factors."[50] Plaintiff

---

[46] 2019 WL 4169635, at *7 (Aug. 26, 2019).

[47] Doc. 10-3 at 38 ("Overall, while the evidence does not show that the claimant's history of migraines is of a *frequency* that would result in significant physical limitations, it is reasonable to conclude her migraines could be exacerbated by environmental irritants."). Again, the Commissioner asserts that the ALJ found that there was no evidence that her migraines were so severe that they resulted in altered or lost consciousness and noted it in his RFC analysis. However, the ALJ made no such finding regarding severity and/or loss of consciousness as the ALJ never discussed loss of or altered consciousness.

[48] 2019 WL 4169635, at *3.

[49] *Id.* at *7.

[50] *Id.* at *4.

13

kept a headache journal, but the ALJ did not discuss it. It is unclear whether the ALJ knew of Plaintiff's headache journals.[51]

As noted elsewhere in the ALJ's order, he found that Plaintiff reported "major headaches that impair her vision and cause sensitivity to light and sound, as well as fluid dripping throughout her head and eyes[;] . . . headaches 3 to 4 times a week lately and that last year her headaches occurred a couple of times per month[;] . . . she lies in dark room for several hours to all day and that her headaches last 8 to 12 hours despite use of Noritriptyline[; and] . . . previously prescribed Topamax, which was of no help and caused her to have a negative reaction."[52] This evidence tends to support the frequency and severity factors in Listing 11.02.

The Court notes, however, that Listing 11.02 requires documentation from an acceptable medical source of a typical headache event. The ALJ did not discuss medical evidence regarding Plaintiff's typical headache event. Perhaps the ALJ did not do so because he believed the medical evidence did not support it, but those specific findings need to be made for the Court to adequately review the ALJ's conclusion that Plaintiff's migraines did not rise to the level of Listing 11.02. "There are . . . numerous decisions which hold that an ALJ's failure to make a

---

[51] The Court notes that Plaintiff references five headache logs: July 2021, October 2021, November 2021, December 2021, and January 2022. Only two headache logs were before the ALJ (July and October), and the remaining three were submitted to the Appeals Council. Two of the three additional logs (December 2021 and January 2022) are irrelevant to the ALJ's determination because they were prepared subsequent to the ALJ's November 29, 2021 determination. *See* 20 C.F.R. § 416.1470(c) ("If you submit additional evidence that does not relate to the period on or before the date of the [ALJ] hearing decision . . . , the Appeals Council will send you a notice that explains why it did not accept the additional evidence and advises you of your right to file a new application."). Here, the Appeals Council informed Plaintiff that this evidence did not "relate to the period at issue." Doc. 10-3 at 3. With regard to the November 2021 headache log, the Appeals Council found that this evidence did "not show a reasonable probability that it would change the outcome of the decision." *Id.* Upon remand, the ALJ may consider this headache journal along with the other evidence of record.

[52] Doc. 10-3 at 33.

specific finding as to medical equivalence between a claimant's chronic headaches and listing 11.02 is reversible error," requiring a remand.[53]

Thus, the medical evidence that the ALJ relied upon to discount Plaintiff's headaches was not substantial.  Because the Court concludes that the step three finding is not supported by substantial evidence, the Court will not move on to determine whether the ALJ's step four finding is erroneous as any change in the step three finding may impact a step four determination.

## V. Conclusion

In sum, the Court finds that there is not substantial evidence in the record to support the ALJ's step three finding.  Accordingly, the Court must reverse and remand.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's decision is **reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g)** for further proceedings consistent with this memorandum and order.

**IT IS SO ORDERED.**

Dated: April 5, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[53] *Lindsay M. v. Kijakazi*, No. 21-2063-EFM, 2022 WL 612452, at *14 (D. Kan. Mar. 2, 2022) (quoting *Phillip v. Saul*, No. 8:19CV422, 2020 WL 4001162, at *25 (D. Neb. July 15, 2020) (collecting cases)).